**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES DEPARTMENT OF STATE, *et al.*, <br><br>              Plaintiffs, <br><br>     v. <br><br> GREGORY PICUR, <br><br>              Defendant. | Case No. 1:18-cv-00041 (JMC) |

## <u>MEMORANDUM OPINION</u>

Defendant Gregory Picur is a former Foreign Service criminal investigator for the Office of Inspector General of the United States Agency for International Development (USAID OIG). [1] For more than a decade, Picur and Plaintiffs—the United States Department of State (the Department) and the United States Agency for International Development (USAID)—have been embroiled in a dispute over the Department's calculation of Picur's retirement annuity. This is the Parties' second time before this Court. The Court last saw them in *Picur v. Kerry (Picur I)*, 128 F. Supp. 3d 302 (D.D.C. 2015), where it vacated the Foreign Service Grievance Board (FSGB)'s decision limiting Picur's retirement annuity and remanded the case for further consideration. The dispute returns to this Court on Plaintiffs' challenge to a subsequent FSGB decision.

Plaintiffs ask this Court to review the FSGB's decision and set it aside as arbitrary, capricious, and not in accordance with law under the Administrative Procedure Act (APA),

---

[1] Unless otherwise indicated, the formatting of quoted materials has been modified throughout this opinion, for example, by omitting internal quotation marks and citations, and by incorporating emphases, changes to capitalization, and other bracketed alterations therein. All pincites to documents filed on the docket are to the automatically generated ECF Page ID number that appears at the top of each page.

5 U.S.C. §§ 701–706. They argue that the FSGB misinterpreted the relevant retirement annuity statute, 22 U.S.C. § 4046, and inflated Picur's annuity in two respects. First, Plaintiffs argue, the FSGB's decision applied an erroneously high multiplier to the income Picur received during his USAID OIG employment when calculating Picur's annuity payments. Second, Plaintiffs contend that the income to which that multiplier was applied was itself too high because it included additional income that Picur received beyond his base salary, in violation of statutory requirements. The Court agrees with Plaintiffs on both fronts and thus **GRANTS** Plaintiffs' cross-motion for summary judgment, **VACATES** the challenged FSGB decision, and **REMANDS** the matter for further consideration consistent with this opinion. Picur's motion for summary judgment is accordingly **DENIED**.

## I.    BACKGROUND

Gregory Picur is a retiree with an extensive career in the federal government. This case turns on the particular retirement systems in which Picur was enrolled during his 25-year tenure as a federal employee and the retirement annuity benefit to which he is entitled by statute as a result. To understand Picur's predicament requires disentangling four distinct—though, at times over the decades, interrelated—retirement systems available to employees like Picur.

First is the Civil Service Retirement System (CSRS). The CSRS, created in 1920, provides a defined-benefit retirement compensation scheme for certain federal employees. U.S. Office of Personnel Management, *CSRS Information*, https://perma.cc/P4FU-54DD. The CSRS's retirement annuity plan provides payments in retirement, and requires employee contributions during their working years, pursuant to the provisions of 5 U.S.C. §§ 8301 *et seq*. In November of 1983, Picur entered federal employment as an accounting clerk with the Internal Revenue Service (IRS) and enrolled in the CSRS. ECF 8-19 at 26.

In 1986, Congress established a new retirement system, the Federal Employees' Retirement System (FERS), for the classes of employees originally covered by the CSRS. *See* Federal Employees' Retirement System Act of 1986, Pub. L. 99-335, 100 Stat. 514. FERS's retirement benefits are governed by the provisions of 5 U.S.C. §§ 8401 *et seq*. One of the central purposes of the legislation was to better integrate federal retirees' benefits with the Social Security system, since federal retirees had originally been excluded from Social Security benefits. *See* Wilmer L. Kerns, *Federal Employees' Retirement System Act of 1986*, 49 Soc. Sec. Bulletin Vol. 11, at 6 (1986). Whereas the CSRS provided one main retirement benefit, the retirement annuity, FERS provided for three complementary benefits: Social Security benefits, a supplemental annuity similar to the CSRS's, and a thrift savings plan (a tax-deferred, matched savings vehicle). *Id.* In short, although the CSRS and FERS required comparable employee contributions and sought to provide broadly comparable benefits, *see id.*, they differed in meaningful ways. For example, the size of the typical annuity payment under the CSRS is calculated as 1.5% to 2% of the employee's average annual base pay multiplied by the number of years of federal service. *See* 5 U.S.C. § 8339(a). By contrast, payments under the FERS basic annuity begin at 1% of the employee's average annual pay multiplied by the total years of service—a significantly lower baseline payment. *See* 5 U.S.C. § 8415(a).

Though FERS went into effect on January 1, 1987, it generally applied to employees who began a covered federal service position on January 1, 1984, or later. ECF 8-19 at 26. Certain employees who entered federal service prior to January 1, 1984—and were enrolled in the old CSRS system—could elect to stay enrolled in the CSRS, with its distinct retirement benefit and contribution provisions, rather than switching to FERS. *Id.*; *see* Federal Employees' Retirement System Act of 1986 § 301, 100 Stat. 599.

On July 8, 1984, Picur was appointed to a law enforcement position within the IRS, where he continued to be covered by the CSRS. ECF 8-19 at 27. Because he began his IRS employment prior to January 1, 1984, he had the right under the 1986 Act to remain in the CSRS rather than switch to FERS. He elected to remain in the CSRS. *Id.* He continued in an IRS law-enforcement role for ten years and participated in CSRS throughout that period. *Id.* Then, in August 1994, Picur left the IRS and joined the USAID OIG as a Civil Service criminal investigator. *Id.* In that role, too, he continued to be covered under the CSRS. *Id.* In 1998, however, Picur converted to the Foreign Service and was appointed to a Foreign Service criminal investigator position within USAID OIG. *Id.* When Picur joined the Foreign Service, his retirement was converted from the CSRS to its Foreign Service equivalent, the Foreign Service Retirement and Disability System (FSRDS)—the third federal retirement benefit system at issue here. *Id.*

The FSRDS, established in the Foreign Service Act of 1980, Pub. L. 96-465, 94 Stat. 2071, provided broadly similar retirement annuity benefits and contribution requirements to the CSRS, but for Foreign Service employees. The FSRDS's features are governed by the distinct statutory provisions of 22 U.S.C. §§ 4041 *et seq*. In 1986, Congress established a replacement for the FSRDS as part of the same omnibus legislation in which it created FERS, the replacement for the CSRS on the Civil Service side. *See* Foreign Service Pension System Act of 1986, Pub. L. 99-335, 100 Stat. 609. Congress's new retirement system for members of the Foreign Service, the Foreign Service Pension System (FSPS)—the fourth and final retirement system at play in this case— provides for benefits and contributions pursuant to 22 U.S.C. §§ 4071 *et seq*. Like FERS, its Civil Service counterpart, the Foreign Service's new FSPS retirement system restructured employees' retirement benefits to incorporate Social Security benefits, a supplemental annuity, and a thrift savings plan. *See* 22 U.S.C. § 4071.

Indeed, certain parallels between the Civil Service and Foreign Service systems were explicitly built into Congress's statutes. When Congress established the FSRDS as the Foreign Service counterpart to CSRS in 1980, it included a provision authorizing (if not requiring) the President to prescribe regulations to "maintain existing conformity between" the CSRS and FSRDS. 22 U.S.C. § 4067(a)-(b) (providing that the President "shall by Executive order prescribe" such regulations). Specifically, under that provision, whenever Congress passes a "law of general applicability" that "affects the treatment of current or former" CSRS participants and affects treatment that had been, "immediately prior to the enactment of" that law of general applicability, "substantially identical to the treatment accorded to" FSRDS participants, the law "shall be extended" by regulation to apply in the same manner to FSRDS participants. *Id.* § 4067(a). In 1986, when it established FSPS for Foreign Service employees, Congress added a paragraph to § 4067 providing for the same degree of similarity, on the same terms, between the two new retirement systems (FERS and FSPS) as had already been in place for the two older systems (CSRS and FSRDS) since 1980. *See* 22 U.S.C. §§ 4067(c). Put more simply, whenever a law modifies features of the two older systems that those systems previously shared with their respective newer systems, the President can by regulation apply those same modifications to the newer systems such that participants in the latter enjoy the same benefits as those in the former. In addition, the statute creating the FSPS states that the statutory provisions applicable to the FSRDS also apply to FSPS participants except as explicitly stated otherwise, creating a tight overlap between the two systems.

Still, the Foreign Service systems continued to differ from their Civil Service counterparts in ways ultimately decisive here. Among such differences was a 1990 amendment to the statutory provisions that revised (and, for many annuitants, enhanced) the calculation formulas for

retirement annuities for participants in the FSRDS (the older system). *See* Pub. L. 101-513, 104 Stat. 2055 (1990).

The first six paragraphs in that amended subsection, codified at 22 U.S.C. § 4046, establish distinct calculation formulas for annuity payments, each applicable to a distinct set of FSRDS participants. § 4046(a)(1) applies to "any participant" except those encompassed by the subsequent paragraphs. It provides for most of those participants (all except certain presidential appointees) an annuity payment equal to "2 percent of [the participant's] average basic salary for the highest 3 consecutive years of service multiplied by the number of years" in service, up to 35 years. 22 U.S.C. § 4046(a)(1). Those highest three consecutive years of service are colloquially known, and referred to throughout relevant documents, as the employee's "high three." *See, e.g.*, ECF 8-19 at 27.

The next paragraphs provide two alternative payment formulas that depart from the FSRDS's standard 2% annuity multiplier, each applicable to a set of Foreign Service criminal investigators/inspectors in USAID OIG who were appointed to law enforcement positions. *See Id.* § 4046(a)(2). First, § 4046(a)(2)(A) applies to USAID OIG Foreign Service criminal investigators/inspectors who were

> appointed to a law enforcement position, as defined in [5 U.S.C. § 8331(20)], prior to January 1, 1984, and would have been eligible to retire pursuant to [5 U.S.C. § 8336(c)], after attaining 50 years of age and completing 20 years as a law enforcement officer had the employee remained in the civil service[.]

22 U.S.C. § 4046(a)(2)(A). Note that 5 U.S.C. §§ 8331(20) and 8336(c) are part of the Title that governs the CSRS, the older Civil Service system. Section 8336(c) sets out the requirements for a law enforcement officer to receive an annuity under the CSRS and, as relevant here, requires that an officer reach 50 years of age and complete 20 years of service in a law enforcement position. The annuity payment for that class of annuitants, under the FSRDS, "shall be computed in the

same manner as that of a law enforcement officer pursuant to [5 U.S.C. § 8339(d)]," another CSRS provision. 22 U.S.C. § 4046(a)(2)(A).  That CSRS provision awards an annuity multiplier of 2.5% of the participant's average pay for each of the first 20 years of that employee's creditable employment, and 2% for each year thereafter. 5 U.S.C. § 8339(d)(1)(A).

The second such paragraph, § 4046(a)(2)(B), governs a different set of annuitants. It reads, in relevant part:

> "[T]he annuity of a Foreign Service criminal investigator of [USAID OIG], who was appointed to a law enforcement position as defined in [5 U.S.C. § 8401(17)] on or after January 1, 1984, and who would have been eligible to retire pursuant to [5 U.S.C. § 8412(d)], after attaining 50 years of age and completing 20 years of service as such a law enforcement officer, had the employee remained in the civil service, shall be computed in the same manner as that of a law enforcement officer pursuant to [5 U.S.C. § 8415(e)]"

28 U.S.C. § 4046(a)(2)(B). Note here that 5 U.S.C. §§ 8401(17), 8412(d), and 8415(e) are all part of the U.S. Code chapter governing the newer FERS system (and are also incorporated by reference into the FSPS system). *See* 5 U.S. Code Chapter 84. That chapter provides that law enforcement officers are entitled to an annuity if they reach 50 years of age and complete 20 years of service in a law enforcement service. 5 U.S.C. § 8412(d). Such officers are entitled to an annuity that is 1.7% of their "average pay" for first 20 years of service, and 1% for every year thereafter. *Id.* § 8415(e).

Throughout his career in federal service, Picur participated only in the two older systems. First, he participated in CSRS and stayed in it after FERS emerged, as discussed above. Then, after entering the Foreign Service, he converted to the FSRDS. There, too, he never elected to switch to its newer replacement, the FSPS. ECF 8-19 at 39. Thus, from 1998 until his retirement in May 2010, Picur was a participant in the FSRDS and contributed to his retirement pursuant to the statutory provisions applicable to FSDRS members, including the 1990 amendment. ECF 8-19 at

27. One of the two disputes in this case concerns which of those provisions' annuity multipliers applies to him based on the facts of his career in federal service.

The second, interrelated dispute before the Court concerns the other component of the annuity calculation: the amount of Picur's pay that should be multiplied by whatever the applicable statutory multiplier is to calculate Picur's retirement annuity. As a Foreign Service criminal investigator, Picur was paid in accordance with the Foreign Service pay scale. *See* 22 U.S.C. §§ 3963, 3966. During the last ten years of his employment—from 2000 to 2010—Picur received an annual salary comprised of both base pay and a "special differential." ECF 8-19 at 27. Base pay is the set figure corresponding with a Foreign Service employee's Class and Step within the Foreign Service salary system. *See* 22 U.S.C. §§ 3963, 3966. A "special differential" is an additional payment, calculated as a percentage of that employee's base salary, for Foreign Service officers "who are required because of the nature of their assignments to perform additional work on a regular basis in substantial excess of normal requirements." 22 U.S.C. § 3972(a).

That distinction matters for purposes of Picur's retirement annuity because the annuity calculation formulas under 22 U.S.C. § 4046 differ in whether they include special differentials as part of the employee's "high three" average salary. According to § 4046(a)(8), annuities calculated under § 4046(a)(1) do not include special differential pay as part of the average salary, whereas annuities calculated under § 4046(a)(2)(A) and § 4046(a)(2)(B) do. Thus, if Picur were subject to the formulas in § 4046(a)(2)(A) or § 4046(a)(2)(B), the amount of his special differential would matter a great deal to his annuity payment; if, on the other hand, he were subject to § 4046(a)(1)'s formula, the amount of his special differential pay would make no difference in the amount of his retirement payments.

Picur's special differential pay has been the subject of ongoing dispute. In March of 2006, USAID Inspector General Donald A. Gambatesa issued a memo authorizing special differential pay for USAID OIG Foreign Service criminal investigators at the rate of 18% of their base pay. *See* ECF 8-1 at 34–35; *see also Picur I*, 128 F. Supp. 3d at 305 (discussing the memo)*.* The Gambatesa memo also provided that OIG would "implement a bi-weekly pay cap for all [Foreign Service] officers" that was equivalent to the GS-15 step 10 salary level. *Id.* at 305–06. The memo included a grandfather clause permitting Foreign Service criminal investigators whose salary exceeded that of the GS-15 step 10 level at the time the memorandum was issued to maintain their current total compensation. *Id.* at 305–06; *see also* AR ECF 8-19 at 59. The total compensation, including special differential, of all other employees subject to the memo would be capped at the GS-15 step 10 level.

In Picur's case, however, the National Finance Center, which processed the pay cap on special differential until 2013, did not code special differentials correctly in Picur's personnel records. ECF 8-2 at 53–56; ECF 8-6 at 17–29. As a result, Picur's salary was never capped pursuant to the bi-weekly salary cap even though he did not qualify for the grandfather clause because his salary was, at the time of the 2006 memo, below the grandfather clause's minimum threshold of the GS-15 step 10 pay level. *Picur I*, 128 F. Supp. 3d at 306–07. When he was later paid above the GS-15 step 10 pay scale, including special differential—for example, in the first pay period in 2009, when the GS-15 step 10 biweekly pay was $5,872.80 and his total pay (base pay plus special differential) for that period was $6,923.20—such pay appeared to erroneously exceed the cap. *See* ECF 8-7 at 93.

These issues came to a head after Picur retired in May 2010, at the age of 50 after 25 years in federal law enforcement. ECF 8-19 at 27. Upon retirement, Picur "was eligible to receive

annuity payments as a participant in the [FSRDS]." *Picur I*, 128 F.3d at 304. As discussed above, the retirement annuity of a Foreign Service criminal investigator is calculated in accordance with the Foreign Service Act of 1980, as amended. *Id.* (citing 22 U.S.C. §§ 4041–4069c-1). As an FSRDS participant, Picur was entitled to an annuity amount pegged to a calculation of his "high three"—his average annual salary during his highest three consecutive years of service. *See* 22 U.S.C. § 4046(a)(1).

Yet, when Picur received his annuity payment based on his high three, both were much lower than he expected based upon the pay he had received while employed and what he thought was the applicable annuity calculation formula. *Picur I*, 128 F.3d at 305; ECF 9-1 at 7.  He contacted the State Department about the discrepancy and discovered that the Department had calculated his high three by retroactively applying the Gambatesa memo's bi-weekly pay cap, even though Picur's salary was never subject to the cap while he was working. *Picur I*, 128 F.3d at 305–06. The Department maintained that Picur's special differentials should have been capped at the GS-15 step 10 level from 2006 onward and that his receipt of special differentials above that cap erroneously boosted his basic pay in the last four years of his employment. *Id.* at 306. (According to the Department's later calculation, Picur was overpaid by a total of $35,298.55 from the period after the Gambatesa memo went into effect in 2006 to his retirement in 2010. ECF 8-7 at 94.) The Department argued that capping Picur's special differential when calculating his high three was necessary to avoid perpetuating those overpayments into Picur's retirement. *Picur I*, 128 F.3d at 306.

### A. First Grievance, FSGB Case No. 2013-031/2013-031R[2]

Picur tried and failed to rectify the perceived error concerning his high three through informal emails and letters to the Department's Bureau of Human Resources, and he then filed a formal grievance with the State Department. ECF 8-1 at 30–32, 63–64, 66–67; ECF 8-19 at 27–28. Picur contended that the Department was required to calculate his annuity based on "the amount of pay that Picur *actually* had received, including the full amount of the special differential," not the amount he *should have* received under the pay cap that the agency never applied to him. *Picur I*, 128 F. Supp. 3d at 306; *see* ECF 8-1 at 17–18. The State Department denied Picur's grievance in a five-page written order, finding that it had properly calculated Picur's high three by using "Picur's salary during his last four years of service, including special differential that he received, but only up to the bi-weekly pay cap" prescribed by the Gambatesa memo. ECF 8-1 at 52–56. Picur appealed the State Department's decision to the FSGB, but the FSGB affirmed the State Department's decision, finding that the Department had calculated Picur's annuity "consistent with existing OIG policy, and compliant with the Gambatesa memorandum that established the policy." ECF 8-2 at 33–34.

Picur sought review of the FSGB's ruling in federal court. He argued that the FSGB's decision was arbitrary and capricious under the APA because it failed to consider that "Foreign Service officers are exempt from pay caps of the type that the Gambatesa memo purportedly imposed" and "in any event, Picur qualified for the Gambatesa memo's grandfather provision." *Picur I*, 128 F. Supp. 3d at 308. The Court did not fully resolve how the relevant statutes should be applied in Picur's case, but agreed with Picur that the FSGB's decision was arbitrary and

---

[2] Picur's first grievance is referred to as No. 2013-031 prior to its remand from this Court and No. 2013-031R following the remand from this Court.

capricious for failing to consult the statutes at issue at all. *Id.* at 310 ("Whatever the appropriate statutory analysis, the administrative record in this case makes crystal clear that the FSGB failed to consult *any* of the statutory provisions that specifically prescribe how an annuity is properly calculated in this context, and it appears to have merely assumed that the State Department has the power to decide that an annuitant's actual high three salary average is too high for the purpose of an annuity calculation."). On remand, the FSGB reversed its earlier decision.  ECF 8-19 at 28–29. It held that the Department erred by calculating Picur's annuity based on a theoretical salary, rather than the actual salary he received, and ordered the Department to re-calculate Picur's annuity based on his actual basic salary plus all special differentials he received as a Foreign Service criminal investigator for USAID OIG. *Id.*

The Department moved for reconsideration based on information it claimed to have learned while recalculating Picur's annuity.  *Id.* at 29. Before the remand decision, both Parties interpreted the Foreign Service Act to mean that Picur was entitled to have special differential included in his "basic pay" as part of his annuity calculation, in accordance with 22 U.S.C. § 4046(a)(2)(8), and that the 2.5% annuity multiplier provided for in § 4046(a)(2)(A) applied. ECF 8-19 at 35; ECF 12 at 37 n.24.  Recall that those provisions apply, by their text, to USAID OIG criminal investigators/inspectors who were "appointed to a law enforcement position . . . prior to January 1, 1984." 22 U.S.C. § 4046(a)(2)(A); *see id.* § 4046(a)(8) (applying to, *inter alia*, *id.* § 4046(a)(2)(A)). After the FSGB remanded to the Department to recalculate Picur's annuity, the Department learned (for the first time, it claimed) that Picur's original position at the IRS was not a law enforcement position, and that he was not employed in a law enforcement position until July of 1984—*after* January 1, 1984, not "prior to" that date. *See*  ECF 8-19 at 31–32. Thus, according to the Department, Picur did not meet the requirements of § 4046(a)(2)(A), which provides for a

2.5% multiplier and includes special differentials as part of high three to which the multiplier applies. Nor did he meet the requirements of § 4046(a)(2)(B), which has a lower multiplier but still includes special differentials, and which the Department interpreted to apply only to those who would have been eligible to retire under FERS, which Picur would not. Instead, per the Department, Picur's annuity was governed by 22 U.S.C. § 4046(a)(1), which prescribes calculating annuities using a 2% multiplier and without considering special differentials. ECF 8-19 at 35, 39–40.

## B.  Second Grievance, FSGB Case No. 2016-030

Around the same time as it moved for reconsideration, the Department revised Picur's personnel records to reflect "what he would have been paid had the pay cap been implemented during his employment." ECF 8-19 at 29.[3] The Department then recalculated Picur's annuity using the amended salary amount and § 4046(a)(1)'s 2% multiplier. *Id.* at 30. After determining that Picur's actual salary and annuity exceeded the recalculated amounts, the Department issued Picur two bills of collection for these overpayments: $35,298.55 for the overpayment of his salary when he was employed, which should have been capped pursuant to the Gambatesa memo but erroneously was not; and another $90,830.69 for overpayment of annuity since his retirement, based on the erroneously large statutory annuity multiplier applied. *Id* at 30 n.5. While the

---

[3] In *Picur I,* the Court held that the Department was "not [] authorized to base an annuity calculation on its own freestanding determination about unexecuted limitations on the participant's prior salary, much less to make a unilateral decision that resolves a dispute about whether the participant was previously overpaid." *Picur I*, 128 F. Supp. 3d at 309. However, it left open the possibility that the Department possessed the authority to use other mechanisms to correct alleged salary overpayments and recalculate an annuity amount based on the annuitant's adjusted salary. *Id.* at 310. For example, it held that "there is nothing in the annuity statute that prohibits the agency from revisiting its initial annuity determination if a corrected basic salary determination is made pursuant such other proceedings." *Id.* This time around, the Department employed the Court's proposed method by correcting Picur's actual salary in his personnel records before recalculating his annuity. The FSGB held that doing so fell within the Department's statutory authority, ECF 8-19 at 56–58, and Picur does not contest that determination.

Department has since waived collection of the former, the salary overpayment, it maintains that the bill of collection for the latter, overpayment of Picur's annuity, is still enforceable. *Id.*

Picur filed a second grievance with the Department and USAID, arguing that the Department could not (a) retroactively apply a cap on his earnings; (b) revise his pay records to reflect that cap; (c) use the revised pay records to calculate his annuity; (d) calculate his annuity with a 2%, rather than a 2.5%, multiplier; or (e) issue the bills of collection for any alleged overpayments. *Id.* at 30. The Department denied the second grievance, and Picur appealed to the FSGB in Case No. 2016-30. *Id.* The FSGB consolidated Picur's two cases, Nos. 2013-013R and 2016-030, and joined USAID as a party to the consolidated appeal. *Id.*

### C. FSGB Decision in the Consolidated Case

On July 11, 2017, the FSGB issued a decision on the merits denying the Department's motion for reconsideration of its remand decision. ECF 8-19 at 24–61.[4] It held that Picur's annuity was not governed by § 4046(a)(1), as the Department argued, but instead by § 4046(a)(2)(A)—the paragraph providing a 2.5% multiplier, applied to pay that includes special differential, for law enforcement officers appointed before January 1, 1984, who would have been eligible for the CSRS had they remained in the civil service.

The FSGB embraced two "independent," alternative arguments to reach that conclusion. ECF 8-19 at 41. First, it reasoned that the language of § 4046(a)(2)(B) is ambiguous and could be read to include Picur because "[i]t is also possible" not to read that section to require eligibility for FERS/FSPS, as the text appears to command. ECF 8-19 at 42–43. "[M]ore likely," they argue, "the drafters of 22 [] U.S.C. [§] 4046 assumed – erroneously – that all employees appointed to law enforcement positions after January 1, 1984, would be participating in FERS/FSPS, which in most

---

[4] The FSGB's July 11, 2016 decision was "corrected" on August 16, 2027 to remove a case citation. AR 1824.

cases would be true" and "may have overlooked" people like Picur who started in CSRS and never elected to transfer to the newer systems. *Id.* Due to that so-called "ambiguity," the FSGB found, it should depart from a "strict reading" of the statute's text and look instead to prudential and legislative history considerations to award Picur a 2.5% annuity multiplier. ECF 8-19 at 49–50. The overriding consideration it relied upon was Congress's "objective – repeated throughout the legislation – to effect parity for officers serving in law enforcement systems, across different personnel systems." *Id.* at 40. In an alternative but related argument, the FSGB contended that the Department's reading of § 4046 "yields results that are highly anomalous and is totally at odds with Congress's intent," and that the absurdity canon supports applying legislative history over the plain text. *Id.* at 43–53. The FSGP also found that USAID was not statutorily authorized to apply the bi-weekly pay cap to Picur's salary. *Id.* at 58–60. Accordingly, it ordered the Department to calculate Picur's annuity by applying a 2.5% multiplier and including the full amount of special differential pay that he received while working. *Id.* at 61.

The Department and USAID filed a complaint in this Court seeking review of the FSGB's decision on the Department's motion for reconsideration. ECF 1. Both Plaintiffs and Picur have moved for summary judgment. ECF 9-1; ECF 12.[5]

---

[5] After the Parties' summary judgment motions and all responses were filed, the Court ordered Plaintiffs to provide supplemental briefing addressing (1) "whether Picur is the appropriate defendant in this case," (2) "whether and to what extent [the Court] can solicit the views of the FSGB regarding the issues in dispute," and (3) "whether FSGB can, and should, be joined as a party." ECF 22 at 3. Plaintiffs responded that (1) Picur is the appropriate defendant, (2) Plaintiffs "do not believe there is a procedural mechanism through which the Court may seek the views of the FSGB regarding its decision in the circumstances of this litigation," and (3) the FSGB neither can nor should be joined as a party in this action. ECF 23 at 6–7. Picur did not respond to this briefing or otherwise indicate disagreement on any of Plaintiffs' positions. Because the Parties have no dispute on any of the three questions raised in the Court's order, ECF 22, and because the Court does not find the FSGB to be a compulsory party under Fed. R. Civ. P. 19 (assuming it even could be joined here), the Court declines to address these questions further and proceeds to decide the merits of this action.

## II.      LEGAL STANDARD

As relevant here, FSGB decisions are subject to judicial review "in accordance with the standards set forth in [the APA.]" 22 U.S.C. § 4140(a). Under the APA, "[s]ummary judgment is the appropriate procedural mechanism for resolving challenges to final agency actions." *Picur I*, 128 F. Supp. 3d at 308 (citing *Stuttering Found. Of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007), *aff'd*, 208 Fed Appx. 383 (D.C. Cir. 2010)). In most civil cases, courts grant summary judgment when the pleadings and evidence demonstrate "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). But this standard does not apply in APA cases "because of the limited role of a court in reviewing [an] administrative record." *Picur I*, 498 F. Supp. 2d at 207. Instead, courts review final agency actions under § 706 of the APA, which empowers them to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

When reviewing agency action under the APA, courts "must exercise independent judgment in determining the meaning of statutory provisions." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2262 (2024). In so doing, courts may "seek aid from the interpretations of those responsible for implementing particular statutes" based on those agencies' "body of experience and informed judgment," *Id.* at 2262 (quoting, in part, *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

## III.      ANALYSIS

The Court reviews the FSGB's decision with respect to two issues. First, the Court determines whether the FSGB ordered the Department to calculate Picur's annuity under the correct section of 22 U.S.C § 4046, or if it misinterpreted the statute and erred in affording Picur a 2.5% annuity multiplier. Second, it addresses whether the FSGB correctly held that Picur is

entitled to include special differentials in his basic salary for purposes of calculating his annuity. The Court finds in favor of Plaintiffs on both questions and vacates the FSGB's decision.

### A. The FSGB Misinterpreted Section 4046, and Picur is Not Entitled to a 2.5% Annuity Multiplier

"When it comes to statutory interpretation, it is a familiar canon that the starting point is the language of the statute itself." *Env't Def. Fund v. Reilly*, 909 F.2d 1497, 1502 (D.C. Cir. 1990) (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania*, 447 U.S. 102, 108 (1980)). Before addressing anything else, a court must "determine whether the statutory text is plain and unambiguous." *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009). If the text is unambiguous, the inquiry is over and the court "must apply the statute according to its terms." *Id.*

Here, the relevant statutory text is unambiguous. Of the three annuity calculation provisions that the parties float as applicable to Picur, only § 4046(a)(1) encompasses, by its text, all the relevant facts of Picur's employment. That paragraph applies generally to "Foreign Service investigators/inspectors" who are not presidential appointees and do not meet one of the other special categories laid out in the subsequent paragraphs. 22 U.S.C. § 4046(a)(1). The next paragraph, § 4046(a)(2)(A), applies only to such investigators/inspectors who (a) are USAID OIG investigators/inspectors, (b) were appointed to a law enforcement position prior to January 1, 1984, and (c) would be eligible to retire under the CSRS had they remained in the civil service. Picur satisfies (a) and (c) but not (b), because he did not obtain a law enforcement position until July of 1984. The third paragraph in that subsection, § 4046(a)(2)(A), applies only to investigators/inspectors who (a) are USAID OIG investigators/inspectors, (b) were appointed to a law enforcement position on or after January 1, 1984, and (c) would be eligible to retire under the newer FERS system if they had stayed in the civil service. Of those requirements, Picur satisfies (a) and (b) but not (c), because he never elected to switch from CSRS to FERS. Notably, neither

Party here argues that § 4046(a)(2)(B) applies; that paragraph offers a lower annuity multiplier (1.7%) than either § 4046(a)(1) (2%, the Department's position) or § 4046(a)(2)(A) (2.5%, Picur's position).

The FSGB and Picur rely on sparse legislative history, comparisons to disparate statutes, and the inapplicable absurdity canon to find that "[t]here is no indication" Congress "inten[ded] to deny law enforcement annuity benefits for [a] small group of officers" like Picur and leave them with the standard 2% annuity formula for Foreign Service investigators generally.[6]  ECF 8-19 at 53. Yet, there is a very strong indicator of Congress's intent to do just that—the text of the statue. Based on that text, interpreted under ordinary principles of statutory interpretation, the Court finds the Department's reading to be correct and the FSGB's and Picur arguments wanting.

First, the Court finds, consistent with the Department's reading, that § 4046(a)(1) applies to Picur. Second, the Court rejects the FSGB and Picur's arguments that § 4046(a)(2)(B) is ambiguous or could be read to apply to Picur, or that any ambiguity in that paragraph could justify the FSGB's conclusion as to Picur's annuity. Third, the Court rejects the FSGB's atextual conclusion that § 4046(a)(2)(A), with its 2.5% multiplier, applies to Picur.

### 1.  *§ 4046(a)(1) Applies to Picur*

The Department is correct: by its plain terms, § 4046(a)(1)'s 2% annuity multiplier applies to Picur. That is because Picur satisfies the only requirement for an annuity under § 4046(a)(1): he is "a participant" in FSRDS. *See* 22 U.S.C. § 4046(a)(1). Thus, even if no other section applies, Picur is entitled to receive an annuity that is 2% of his high three multiplied by his years of service, not exceeding 35 years. *Id.*

---

[6] Picur's motion for summary judgment "adopt[s] . . . as a correct statement of the law" the FSGB's "analysis, holding and rationales" as to its interpretation of the statute, so arguments attributed in the remainder of this opinion to the FSGB can also be attributed to Picur. ECF 9-1 at 16.

Notably, Picur does not dispute that § 4046(a)(1) can be read to encompass him. *See, e.g.*, ECF 8-19 at 40 ("[Picur] agrees that, on its face, the Department's reading of [§ 4046] appears to be correct."). Rather, he argues—and the FSGB agreed—that § 4046(a)(2) can *also* be read to cover him, and that there are prudential and legislative history reasons to find that Congress intended to include him in this later provision. *See* ECF 9-1 at 16–18; ECF 15 at 20–22; ECF 8-19 at 40–53. As the following sections will explain, that conclusion is without merit.

### 2.   *§ 4046 is Not Ambiguous, and § 4046(a)(2)(B) Does Not Apply to Picur*

The first basis that Picur and the FSGB put forward for departing from the statute's plain text is their argument that § 4046 is ambiguous. ECF 8-19 at 42–43. Despite its apparent textual applicability only to annuitants who would be eligible to retire under the FERS system had they remained in the civil service, the FSGB held that § 4046(a)(2)(B) was "not so 'clear-cut'" and could be read to include Picur. ECF 8-19 at 42, 53. Not so.

Section 4046(a)(2)(B) sets the annuity multiplier for USAID OIG criminal investigators who (1) "[were] appointed to a law enforcement position . . . on or after January 1, 1984," and (2) "would have been eligible to retire pursuant to [5 U.S.C. §] 8412(d), after attaining 50 years of age and completing 20 years of service as such law enforcement officer, had the employee remained in the civil service." As relevant here, § 8412(d) establishes that FERS/FSPS participants are "entitled to an annuity . . . after becoming 50 years of age and completing 20 years of service as a law enforcement officer." 5 U.S.C. § 8412(d)(1)(B). Picur satisfies only one of § 4046(a)(2)(B)'s two requirements. While he started in a law enforcement position after January 1, 1984, ECF 8-19 at 27, he never elected to participate in FERS, *id.* at 26, 39, and so could not have been "eligible to retire" under that system, 5 U.S.C. § 8412(d). Section 4046(a)(2)(B) presents little, if any, ambiguity and on its face does not apply to Picur.

The FSGB circumvented this outcome by holding that it is "not necessary" to read § 4046(a)(2)(B) as requiring "that the employee must also be a participant in the FERS/FSPS system of which 8412(d) is a part." ECF 8-19 at 42. It put forth an alternative reading: § 4046(a)(2)(B)'s reference to § 8412(d) only requires that an annuitant comply with the eligibility criteria specified in § 8412(d) itself, rather than to "other eligibility criteria that may be applicable to retirements under 8412(d) but are found in separate provisions." ECF 8-19 at 42. Thus, an employee could satisfy § 4046(a)(2)(B)'s "eligible to retire pursuant to § 8412(d)" requirement by reaching the age of 50 and serving for at least 20 years, even if they did not actually qualify to retire under FERS/FSPS. The FSGB's interpretation would cover Picur, but it begs too much.

First, the Court must follow the "cardinal rule that statutory language must be read in context." *Hibbs v. Winn*, 542 U.S. 88, 101 (2004). Part and parcel of this principle is the "rule against superfluities," which instructs this Court to interpret a statute "so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Id.* Picur asks this Court to read § 4046(a)(2)(B)'s reference to § 8412(d) as a mere adoption of that latter section's age and term of service requirements. But § 4046(a)(2)(B) includes its own age and term of service requirements. It expressly provides that an annuitant only qualifies for an annuity "after attaining 50 years of age and completing 20 years of service as such a law enforcement officer." 22 U.S.C. § 4046(a)(2)(B). If Picur were correct and § 4046(a)(2)(B) only meant to incorporate § 8412(d)'s age and term of services requirements—which are also 50 and 20 years, respectively— one of the two clauses would be duplicative. To give effect to the full statute, then, the reference to § 8412(d) must incorporate more than that statute's age and term of service requirements. Rather, § 4046(a)(2)(B) means what it says: the annuitant must have been eligible to retire *under the FERS/FSPC system*.

Second, (a)(2)(B) uses a formula to calculate annuities that applies to retirement systems other than FSRDS. It provides that annuities "shall be computed in the same manner as that of a law enforcement officer pursuant to [5 U.S.C.] section 8415(e)." 22 U.S.C. § 4046(a)(2)(B). Section 8415(e) applies to FERS/FSPS participants, rather than FSRDS participants like Picur. ECF 8-19 at 42. Per the FSGB's opinion, these systems "differ in ways that would make it inappropriate to calculate the annuity of an FSRDS participant like [Picur] by applying the FSPS formula." *Id*. In the Court's view, this mismatch is a strong indicator that (a)(2)(B) was never meant to apply to a FSRDS annuitant like Picur. The FSGB, on the other hand, interpreted this incongruence as a mistake by Congress, which "more likely than not . . . assumed—erroneously— that all employees appointed to law enforcement positions after January 1, 1984, would be participating in FERS/FSPS" and thus inadvertently excluded Picur by setting a "date of appointment" rather than "date of initial hire" deadline. *Id.* at 42–43. Inventing ambiguity from this alleged mistake, the FSGB found that (a)(2)(B) was inconsistent and ambiguous because it described "eligibility for the relevant annuity in terms that could apply to [Picur], but provided that the amount of the annuity will be determined by a formula that is inappropriate." *Id.* at 43.

The FSGB's reasoning is flawed. For one, the FSGB cannot pick and choose which portions of a statute it applies. If Picur's annuity is governed by § 4046(a)(2)(B), then his annuity must be calculated in accordance with § 8415(d). The multiplier set out in § 8415(e) is not the 2.5% the FSGB ordered. Rather, it is "[1.7] percent of [an employee's] average pay" for the first "20 years" of service, and "1 percent" of that average for every year of service "as exceeds 20 years." 5 U.S.C. § 8415(e). Picur and the FSGB offer no reason why these rates would be inappropriate, were he "eligible" to retire pursuant to § 8412. Instead, they effectively ask the

Court to read out and render inoperative the entire last clause of the statutory paragraph, violating once again the rule against superfluities. *See* ECF 12 at 29 n.18.

Further, (a)(2)(B)'s eligibility requirements and § 8415(d)'s annuity formula are not inconsistent. Ambiguity only arises if one adopts the FSGB's interpretation that an annuitant can meet (a)(2)(B)'s eligibility requirement without being able to retire under FERS/FSPS—an interpretation the Court declines, as explained above. Finally, and most importantly, the FSGB may not render clear text ambiguous by guessing at Congress's intent, as it does here. *See* ECF 8-19 at 43. The FSGB could be right; Congress could have made a mistake. But it is not for a court or a board to rewrite an otherwise clear statute, or even to guess if a mistake might have been made. "It is beyond our province to rescue Congress from its drafting errors, and to provide for what we might think is the preferred result." *Lamie v. U.S. Tr.*, 540 U.S. 526, 542 (2004).

For these reasons, the Court concludes that the FSGB's interpretation of § 4046(a)(2)(B) was contrary to law and that the provision does not apply to Picur.

### 3.   *§ 4046(a)(2)(A) Does Not Apply to Picur*

Just as Picur cannot wring a 2.5% annuity payment out of § 4046(a)(2)(B), neither is he eligible for the 2.5% multiplier provided by § 4046(a)(2)(A). Section 4046(a)(2)(A) is clear as to what it requires, and Picur does not meet its requirements.

For a USAID OIG criminal investigator to qualify for an annuity under (a)(2)(A), they must have: (1) been "appointed to a law enforcement position …prior to January 1, 1984," and (2) "been eligible to retire pursuant to section 8836(c) of [title 5], after attaining 50 years of age and completing 20 years a law enforcement officer had the employee remained in the civil service." 22 U.S.C. § 4046(a)(2)(A). Again, Picur cannot satisfy one of the prerequisites. Both sides acknowledge that, while Picur joined the IRS in 1983, he was not appointed a law enforcement position until July of 1984, well past the January 1 cut-off. *See* ECF 1 ¶ 13; ECF 15 at 20; ECF 8-

19 at 32; *see also id.* at 26–27 (outlining Picur's relevant employment history). There is no way to bridge the gap between § 4046(a)(2)(A)'s "must-start by" requirement and Picur's start date. This requirement is not flexible: an employee either "was appointed to a law enforcement position . . . prior to January 1, 1984" or was not, and the answer to that question is dispositive. *See* 22 U.S.C. § 4046(a)(2)(A).

Picur, in line with the FSGB's decision, asks this Court to adopt a reading of § 4046(a)(2)(A) that ignores the "must-start-by" requirement. ECF 8-19 at 45–53. The thrust of his argument is that § 4046(a)(2)(A) applies to Picur not because the text of the statute supports that conclusion, but because reading statute literally renders "highly anomalous results." ECF 8-19 at 49, 1843–53; ECF15 at 23. "[Picur] would be subject," the FSGB continued, "to an anomalous outcome – one unintended by the Congress – if the result relied on a literal reading of 22 U.S.C. § 4046 with respect to the date of his entry into a law enforcement position." ECF 8-19 at 49. That unintended anomaly, according to the FSGB, is Picur's eligibility for only a 2% annuity multiplier, whereas both (a) Civil Service employees who started in federal service before January 1, 1984 but never transferred, as Picur did, to the Foreign Service, and (b) USAID OIG Foreign Service investigator/inspectors who started in a law enforcement position, as opposed to Picur's original non-law enforcement position, prior to January 1, 1984, qualify under the statutes for a 2.5% multiplier. Congress did not intend, according to the FSGB, "to single out a select – and seemingly random – few for deprivation of these benefits." *Id.* at 50.

The FSGB relied on various indicators of congressional intent—including statutes governing retirement systems other than the one Picur participated in, internal USAID documents, and provisions of the Foreign Affairs Manual—to support its conclusion that Congress could not possibly have intended to exclude Picur from § 4046(a)(2)(a) based solely on the date he was

appointed to a law enforcement position and the type of service he was in. *See id.* at 44, 50–54. For example, the FSGB pointed to 22 U.S.C. § 4067, which permits the President to promulgate regulations applying to FSRDS participants changes made by Congress to the CSRS system. *Id.* at 54. Yet, the 1990 congressional amendments at issue here were made to the FSRDS, not the CSRS. *See id.* (acknowledging, "technically this law does not apply to [Picur's] situation, because there was no change in the CSRS that was not carried over to the FSRDS" but nonetheless arguing that the statute broadly "demonstrates Congress' desire to maintain conformity between the benefits provided under the two systems."). The FSGB also found "no legislative history or evidence" to suggest that Congress intended to create a unique, appointment-date requirement for USAID OIG criminal investigators that required them to be hired specifically into a law enforcement position, rather than any federal position, by a certain date. *Id.* at 53. From this, the FSGB concluded that Congress must have erred and assumed all USAID-OIG Foreign Service criminal investigators' first appointments were to law enforcement positions. *Id.* Its true intent, therefore, was to include Picur and those in his situation in § 4046(a)(2)(a) despite Picur's late appointment. *Id.* at 52.

The FSGB put the cart before the horse. Setting aside the quality of the FSGB's sources of legislative history, which is at times questionable,[7] the FSGB may not turn to "[e]xtrinsic

---

[7] The FSGB argued that the relevant legislative history supported its finding that § 4046(a)(2)(A) must have been meant to cover Picur. *See, e.g.*, ECF 8-19 at 49, 33–34. And yet, its main legislative history citation is a single sentence from the 1990 Senate Report cataloguing an amendment to the statute: "Sec. 588 is a new provision which provides equitable treatment of the [USAID] Inspector General's foreign service criminal investigators/inspectors with their civil service counterparts." *Id.* at 50. The FSGB relied on other materials to pad what it itself called "scant legislative history," *id.*, turning to documents much further down the list of valuable indications of intent, like a memorandum from the Inspector General of USAID from before the 1990 amendment. *Id.* at 51. While courts may give some weight to pre-enactment interpretations of statutory terms by executive departments when they participated in the drafting of the statute—which neither side indicates was the case with respect to the USAID memorandum—the FSGB offered no evidence that USAID even provided this memorandum to Congress when legislators were drafting the amendment. *See, e.g.*, *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 27–30 (1982) (crediting a statutory definition offered in a pre-enactment Treasury Department memorandum because the department proposed and drafted the statute and transmitted it to Congress); *see also Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 203 n.24 (1976) (explaining that statements "made in the course of legislative debate or hearings other than by persons responsible for the preparation or the drafting of a bill" are "entitled to little weight"). These vague materials of limited reliability cannot possibly

materials" to evade clear text. *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) ("Extrinsic materials [like legislative history] have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms."); *see also Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 808–09 n.3 (1989) ("Legislative history is irrelevant to the interpretation of an unambiguous statute."); *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 339 (D.C. Cir. 2020) ("[W]e do not resort to legislative history to cloud a statutory text that is clear.").

Certainly, the FGSB cannot make a negative inference from a *lack of* legislative history that Congress must have meant something other than what the text says. In statutory interpretation, we presume that Congress "says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–254 (1992). There is little clearer than a date certain. The Court will not, and the FSGB may not, dispense of such a clear-cut requirement merely because it cannot discern why "the Congress might have intended that employees like [Picur], who dedicated a career to law enforcement, would not receive law enforcement benefits" or because it "do[es] not believe that the drafters of this provision, or Congress, intended this outcome." ECF 8-19 at 46. When the text is clear, what an interpreter believes Congress wanted or thought is of no concern—the interpreter must enforce the statute by its terms, even if the outcome seems unfair. *See Dodd v. United States*, 545 U.S. 353, 359 (2005) ("Although we recognize the potential for harsh results in some cases, we are not free to rewrite the statute that Congress has enacted."). And, "[i]f Congress enacted into law something different

---

overcome the clear dictate of the statutory text at hand. Neither can 3 Federal Affairs Manual 6115.5, post-enactment policy guidance issued by USAID that merely references 22 U.S.C. § 4046, as amended, in its entirety and fails to support the FSGB's strident claim that the amendment's purpose was to "equalize benefits between Civil Service and Foreign Service employees" beyond what § 4046's plain text provides. ECF 8-19 at 51–52.

from what it intended, then it should amend the statute to conform it to its intent." *Lamie*, 540 U.S. at 542.

The FSGB and Picur try to turn those cardinal rules of statutory interpretation on their head by relying on the absurdity canon. ECF 8-19 at 46 ("[C]ourts should not interpret a statute literally if it leads to an 'absurd' or anomalous result, and is not consistent with the overall statutory scheme.") (citing *United States v. Am. Trucking Ass'ns*, 310 U.S. 534 (1940)). But it is not anomalous, much less "absurd," that § 4046(a)(1) applies to Picur. The absurdity canon "is a canon of last resort where there is statutory ambiguity." *United States v. Cook*, 594 F.3d 883, 890 (D.C. Cir. 2010) (quoting *United States v. R.L.C.*, 503 U.S. 291, 305–06 (1992)). § 4046 is not ambiguous, and so the absurdity canon has no role in interpreting it.

And even if the statute were ambiguous, reading § 4046 literally does not satisfy absurdity's high threshold. *Cook*, 594 F.3d at 890. The Department's interpretation does not "def[y] rationality" by "rendering a statute nonsensical or superfluous" or create "an outcome so contrary to perceived social values Congress could not have intended it." *Id.*; *see also United States v. Long*, 997 F.3d 342, 356 (D.C. Cir. 2021) ("[C]ourts may not use the absurdity canon to set aside plain text unless the absurdity and injustice of applying the provision to the case would be so monstruous that all mankind would, without hesitation, unite in rejecting the application."). It may be "debatable policy" to exclude Picur from the classes of criminal investigators who receive a 2.5% annuity, "but it is hardly irrational." *Landstar Express Am., Inc. v. Fed. Maritime Comm'n*, 569 F.3d 493, 499 (D.C. Cir. 2009); *see also Barnhart v. Thomas*, 540 U.S. 20, 28 (2003) (agency's statutory interpretation did not create "absurd results" because there was a "plausible reason why Congress" might have intended those results).

At different times and for different reasons, Congress has differentiated between federal retirement systems. *See* ECF 12 at 35–36 (describing contrasting annuity calculation provisions across retirement systems). Indeed, recall that the new FERS and FSPS systems that Congress created in its 1986 reforms significantly departed from the old CSRS and FSRDS systems by coordinating those benefits more closely with the Social Security system and adding a new thrift savings program on top of the older retirement annuity model. *See* Kerns, *Federal Employees' Retirement System Act of 1986*, at 5. It stands to reason that such reforms would have resulted in differential treatment between participants in the old systems and those who elected to switch to the new ones—an option Picur had but never pursued. The Court may not rewrite Congress's statute as written when it dictates such a plausible, non-absurd result.

Moreover, Picur's and the FSGB's argument inverts yet another canon of statutory interpretation: "[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002). The fact that § 4046(a), according to the FGSB, "is the only statute of which the Board is aware that adds a specific 'must-start-by' date in a law enforcement position to the standard minimum age and years of service requirement, in order for an annuitant to be eligible to receive law enforcement benefits," ECF 8-19 at 45, is *more* of a reason to strictly adhere to that requirement, particularly where the statutory language is as "clear and unambiguous" as it is here, *Sigmon Coal*, 534 U.S. at 460.

Further, the cases the FSGB and Picur cite in support of the FSGB's absurdity finding are inapposite. *See* ECF 8-19 at 47–49; ECF 15 at 19. In *Wassenarr v. Office of Personnel Management*, both parties agreed that the statutory provisions in question rendered "an illogical result" and the

court held that the state was ambiguous. 21 F.3d 1090, 1094 (1994). Here, the parties disagree, and § 4046 is unambiguous. *Wassenarr* also dealt with a very different situation, wherein multiple provisions of the CSRS survivor statute interacted and rendered one provision "a nullity under which no survivor annuity would ever arise." *Id.* at 1093. None of the § 4046 provisions discussed in this opinion renders another null; Picur just falls under a different paragraph than most Foreign Service criminal investigators. Meanwhile, *American Trucking* simply stands for the proposition that, when a statute's plain meaning leads to absurd results, courts may look beyond a statute's text to "the purpose of the act." 310 U.S. at 543–44. It does not support a finding of absurdity in this case.

While not absurd, the Court recognizes that this outcome seems unfair. The Court is sympathetic to the FSGB's and Picur's objection that this outcome denies a small group of people—each of whom served this country for more than 20 years—a higher annuity simply because of the timing of their appointment and choice of retirement program. *See* ECF 8-19 at 45. These individuals may, like Picur, be subject to bills of collection for overpayment of salary and annuity since retirement. *Id.* at 30. That is unfortunate, but it is consistent with the statute's text and not so absurd as to justify disregarding the statute's clear requirements. Further, while Picur may be prejudiced because he paid into FSRDS at contribution levels consistent with a 2.5% multiplier, he has remedies other than an annuity he does not qualify for. For example, he may seek refunds for excess contributions. *See* ECF 12 at 37.

Accordingly, by failing to comport with the plain meaning of § 4046 and relying on extrinsic materials despite the statute's clear text, the FSGP acted contrary to law in determining that § 4046(a)(2)(A) and/or (a)(2)(B) governed Picur's annuity calculation.[8]

## B. Section 4046 Precludes Including Special Differential Payments in Picur's Basic Salary for the Purpose of Annuity Calculations

Having found that the 2% multiplier of § 4046(a)(1), as opposed to any other multiplier in that subsection, applies to Picur, the Court next considers whether the Department must include special differentials in its calculation of Picur's annuity. The Department argues that § 4046 only permits a few categories of Foreign Service criminal investigators to include special differentials in the calculation of their annuity—and that Picur does not fall into any of these categories because his annuity is governed by § 4046(a)(1). ECF 12 at 37–39. As explained above, § 4046(a)(1) provides that a participant's annuity is calculated as 2% of the participant's high-three, which is "his or her average basic salary for the highest 3 consecutive years of service, multiplied by the number of years, not exceeding 35." 22 U.S.C. § 4046(a)(1). Here, the key phrase is "average basic salary," which is used interchangeably with "basic pay" in § 4046.[9] The question before the Court

---

[8] Because the Court finds § 4046's text to be unambiguous, the Court does not resolve the parties' arguments about the degree of deference owed to the Department in its interpretation of the statute at issue. Plaintiffs argue at length that the FSGB erred in not deferring to the Department's interpretation of § 4046 pursuant to the now-overruled framework of *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). ECF 12 at 20–23; ECF 16 at 3–7. And even if *Chevron* deference were not owed, Plaintiffs argue, the less deferential rule of *Skidmore*, 323 U.S. 134, which is still good law, would apply instead. ECF 12 at 23; *see Loper Bright*, 144 S. Ct. at 2262, 2267 (affirming courts' use of agencies' "body of experience and informed judgment, among other information" when "resolv[ing] statutory ambiguities"). Picur, meanwhile, argues that the Department's statutory interpretation was owed no deference because "Plaintiffs do not administer the pension calculating statutes – the Office of Personnel Management does" and that, either way, the FSGB properly applied *Chevron*. ECF 15 at 17–19. The Court declines to decide what degree of deference is owed to the Department's interpretation of § 4046 after *Loper Bright*, 144 S. Ct. 2244, because the Department's and Plaintiffs' reading of the statute here is correct under any deference or non-deference regime.
[9] *See, e.g.*, 22 U.S.C. § 4046(a)(9) ("For purposes of any annuity computation under this subsection, the basic salary or basic pay of any member of the Service whose official duty station is outside the continental United States shall be considered to be the salary or pay that would have been paid to the member had the member's official duty station been Washington, D.C.").

is to determine which employees include special differentials in their basic pay, and whether Picur is among them.

The answer follows directly from the Court's conclusion above that only § 4046(a)(1) applies to Picur. Section 4046(a)(8) limits the number of employees for whom special differentials are included in basic pay. It provides that "basic pay" includes special differentials for purposes of paragraphs (a)(2), (a)(3), (a)(4), and (a)(6). *Id.* § 4046(a)(8). Congress's choice to enumerate four specific paragraphs is significant. The well-established interpretive canon *expressio unius est exclusio alterius* instructs that "expressing one item of an associated group or series excludes another left unmentioned." *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017). Here, the reference to (a)(2), (a)(3), (a)(4), and (a)(6) in (a)(8) creates a sensible, negative inference that "the term[s] left out must have been meant to be excluded." *Id.* Indeed, if other sections of § 4046 included special differentials in basic pay, § 4046(a)(8) would lack purpose or meaning, contravening the rule against superfluities. *See Hibbs*, 542 U.S. at 101. In keeping with both canons, the Court must read § 4046(a)(8) as excluding special differentials from basic pay in every paragraph of the statute other than those it lists. *See Nasdaq Stock Mkt. LLC v. Sec. & Exch. Comm'n*, 38 F.4th 1126, 1137 (D.C. Cir. 2022) ("[W]e have observed that the canon against surplusage and the *expressio unius* canon are at their zenith when they apply in tandem, as they appear to do here."). That includes § 4046(a)(1), which covers Picur and is not listed in (a)(8).

Picur accepts this outcome as to most employees who fall under § 4046(a)(1). ECF 15 at 23–24. However, he argues that *some* individuals covered by (a)(1)—including law enforcement officers, like himself—are nevertheless entitled to include special differentials in the calculation of their annuity. ECF 9-1 at 18–19. His argument rises from subsection (a)(4), which is covered by (a)(8) and provides that "[a]ll service in law enforcement … in any agency or combination of

agencies shall be included in the computation of time for purposes of this paragraph." 22 U.S.C. § 4046(a)(4). As a law enforcement officer, Picur falls under (a)(4) for purposes of calculating his service credits. ECF 9-1 at 18–19. Because (a)(4) is listed in (a)(8), he reasons that the Department must include special differentials in the basic pay of any law enforcement officers whose service credit is calculated under (a)(4)—including those that fall under (a)(1). *Id.*

The Court is unpersuaded. Section 4046(a)(4) is unlike the other subsections listed in (a)(8). Each of (a)(2), (a)(3), and (a)(6) describes a category of annuitant and the formula for calculating their annuity—including, for example, the annuity multiplier and the years for which that multiplier applies. *See* 22 U.S.C. §§ 4046(a)(2), (3), (6). On the other hand, (a)(4) is merely a time-tracking measure; it establishes how to determine one component of the formula (time) and makes no reference to the component relevant to Picur's challenge (basic pay). The Court cannot apply (a)(8), which defines "basic pay" for a subset of employees, to (a)(4), a provision which does not mention any kind of compensation. As such, (a)(4) does not provide an independent basis to include special differentials in Picur's annuity. Instead, the rule laid out in § 4046(a)(1) applies to Picur: a 2% annuity multiplier on a high three average pay that does not include any special differential.

Having determined that § 4046 does not authorize the Department to include special differentials in Picur's annuity calculation, the Court need not address the Parties' arguments concerning to the Department's authority to cap Picur's receipt of special differentials. The FSGB's decision contravened law by requiring the Department to include *any* special differentials, capped or otherwise, in Picur's annuity calculation.

*    *    *

The FSGB's decision was not in accordance with law and must be held unlawful and set aside under the APA. Therefore, it is **ORDERED** that Plaintiffs' cross-motion for summary judgment is **GRANTED**, the FSGB's decision is **VACATED**, and this matter is **REMANDED** for further proceedings. Defendant's motion for summary judgment is accordingly **DENIED**. A separate order accompanies this memorandum opinion.

**SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: October 16, 2024